UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARCUS DARNELL EBRON,

              Plaintiff,

v.                                     Case No. 3:16-cv-148-J-34PDB

JUSTIN K. BRIDGEMAN AND
TYLER P. STAFFORD,

              Defendants.

_____

## **ORDER**

### **I. Status**

Plaintiff Marcus Darnell Ebron, an inmate of the Florida penal system, initiated this action on February 17, 2016, by filing a Civil Rights Complaint (Complaint; Doc. 1) pursuant to 42 U.S.C. § 1983. In the Complaint, Ebron names Justin K. Bridgeman and Tyler P. Stafford, who are corrections officers employed with the Jacksonville Sheriff's Office (JSO) and assigned to the John E. Goode Pretrial Detention Facility (Jail) in Jacksonville, Florida. He asserts that the Defendants violated his federal constitutional rights when they exposed him to conditions of confinement that posed a substantial risk of serious harm to his health and safety. As relief, he requests compensatory and punitive damages as well as declaratory relief.

This matter is before the Court on Defendants Bridgeman and Stafford's Motion for Summary Judgment (Motion; Doc. 22). They

submitted exhibits in support of their request for summary judgment.[1] See Defendants' Notice of Filing Documents and Exhibits in Support of Motion for Summary Judgment (Doc. 23); Defendants' Supplemental Notice of Filing Exhibits in Support of Motion for Summary Judgment (Doc. 25). The Court advised Ebron of the provisions of Rule 56, Federal Rules of Civil Procedure (Rule(s)), notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. See Summary Judgment Notice (Doc. 24); Order Directing Service of Process Upon Defendants; Notice to Plaintiff (Doc. 8) at 3-4, ¶ 7. Ebron responded. See Response to Defendants' Motion for Summary Judgment (Response; Doc. 29); Declaration in Opposition to Defendants' Motion for Summary Judgment (Ebron Decl.; Doc. 30);[2] Notice of Filing Document and Exhibit in Support of Plaintiff's Response (Doc. 31); Plaintiff's Statement of Disputed Factual Issues (Statement; Doc. 32). Accordingly, this matter is ripe for review.

---

[1] Defendants submitted the following exhibits: Ebron's Deposition (Ebron Depo.; Doc. 23-1); Justin K. Bridgeman's Declaration (Bridgeman Decl.; Doc. 23-2); Tyler P. Stafford's Declaration (Stafford Decl.; Doc. 23-3); Joel Carter's Declaration (Carter Decl.; Doc. 23-4); and Declaration of Dana Barnes, M.D. (Barnes Decl.; Doc. 23-5).

[2] Ebron submitted Sergeant J.T. Carter's Investigative Report (Carter Report) as exhibit A. See Doc. 30-1 at 1-32.

## II. Plaintiff's Allegations[3]

In his verified Complaint,[4] Ebron asserts that he was in JSO custody and housed at the Jail as a pretrial detainee on the fifth floor, west wing, dormitory two in cell #29 (5W2-29) on February 10, 2012. See Complaint at 2, ¶ 7. He states that he shared cell 29 with Kenneth L. Thompson and Brian Long. See id. at ¶ 8. He maintains that the Jail assigned Defendants Bridgeman and Stafford to the 5W control room that overlooks four dormitories (5W1, 5W2, 5W3, and 5W4). See id. at ¶ 9. He avers that, at the time of the incident, Stafford was operating the control room switchboard. See id. at ¶ 11. According to Ebron, at approximately 6:45 p.m. on February 10th, he and other detainees (Orlando Cartagena, Brian M. Wofford, and Michael Santana) used a plastic trash bag filled with six to eight gallons of water (commonly known as a water bag) to exercise in the cell. See id. at ¶ 12. He states that Long was in the cell at the time of the incident, but Thompson was not. See id. at ¶ 13. Ebron asserts that he saw Bridgeman and Stafford in the 5W control room, as they watched him, Cartagena, Wofford, and Santana

---

[3] The facts recited here are drawn from the Complaint and may differ from those that ultimately can be proved.

[4] See Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014) (citations omitted) ("The factual assertions that [Plaintiff] made in his amended complaint should have been given the same weight as an affidavit, because [Plaintiff] verified his complaint with an unsworn written declaration, made under penalty of perjury, and his complaint meets Rule 56's requirements for affidavits and sworn declarations.").

exercise with the water bag. See id. at ¶ 14. According to Ebron, Bridgeman and Stafford exchanged words, Stafford went to the switchboard to unlock the doors, and Bridgeman exited the control room. See id. at 2-3, ¶¶ 15-17.

Ebron avers that, when he saw Bridgeman exit the control room, he stopped exercising and tried to hide the water bag under Thompson's bed. See id. at 3, ¶ 18. He states that Bridgeman entered the cell, "brandished a black, flip-action, hunting knife," and directed that Ebron move away from the water bag. Id. at ¶¶ 19-20. Ebron maintains that he complied with Bridgeman's order. See id. at ¶ 20. According to Ebron, Bridgeman knelt down, pulled the water bag from underneath Thompson's bed, stabbed it multiple times with the knife, watched the water spill on the floor, and then immediately ordered that the inmates exit the cell. See id. at ¶¶ 21-22. He states that Bridgeman signaled to Stafford, who was manning the control room switchboard, and Stafford unlocked the cell door from its fully open position which enabled Bridgeman to lock the cell door into its fully closed position. See id. at ¶ 23. Ebron declares that Bridgemen neither removed the water bag from the cell, cleaned up the spillage, permitted them to remove the water bag from the cell, nor allowed them to clean up the water before he closed and locked the cell door. See id. at ¶¶ 25-26. He asserts that no more than five minutes passed from when he exercised with the water bag at 6:45 p.m. until Bridgeman exited

the 5W2 dormitory and returned to the control room. <u>See</u> <u>id.</u> at 4, ¶ 28.

Ebron maintains that JSO routine procedure provides that all cells doors must remain in the fully open position during the day until 8:25 p.m., when they are unlocked in preparation of lockdown, and at 8:30 p.m., all inmates are locked inside their assigned cells until 5:00 a.m. the next morning. <u>See</u> <u>id.</u> at ¶ 29. He avers that his cell door remained locked and shut in its fully closed position with the water bag and spillage on the floor from approximately 6:50 p.m. until 8:25 p.m. <u>See</u> <u>id.</u> at ¶ 30. According to Ebron, he and his cellmates asked Bridgeman and Stafford multiple times from 6:50 p.m. until 8:25 p.m. for permission to clean up the water, but neither Bridgeman nor Stafford allowed them, or anyone else, to do so. <u>See</u> <u>id.</u> at ¶ 31. He states that, at 8:25 p.m., Stafford used the switchboard to simultaneously unlock the cell doors for lockdown and turn off each cell's lights, and directed inmates over the loud speaker to report to their assigned cells. <u>See</u> <u>id.</u> at ¶ 32.

Ebron avers that cellmates Thompson and Long entered the cell at 8:25 p.m. and tried "to clean up the water as best they could, in the dark, with lockdown underway." <u>Id.</u> at ¶ 35. He declares that he entered the cell to help them when he "lost his footing in the water and slipped, feet first, hitting his head on the sink and his back on the toilet[,] then hitting the ground." <u>Id.</u> at ¶ 36. He

maintains that he was immobile and experienced serious pain as a result of the slip and fall. See id. at 5, ¶ 37. According to Ebron, his cellmates secured Bridgeman's attention. See id. at ¶ 38. He avers that Bridgeman initially advised him: "You'll be alright, just get on up and we'll help you on down to medical." Id. He states that Bridgeman noticed Ebron's unresponsiveness and retrieved a wheelchair. See id. Ebron declares that Bridgeman tried to lift him into the wheelchair, but placed him back on the floor when a bone in Ebron's back made "a popping noise." Id. at ¶ 39. He asserts that a third officer arrived and told Bridgeman that they should not use a wheelchair "in this type of situation," and advised him to report a signal 17 medical emergency, which Bridgeman did. Id. at ¶¶ 40, 41. He states that about ten minutes passed from his slip and fall until Bridgeman reported the incident as a medical emergency. See id. at ¶ 41.

Ebron asserts that, as the medical staff lifted him onto a gurney, he informed Sergeant Banks that Bridgeman popped the water bag with a knife. See id. at ¶ 43. He avers that a medical team transported him to the Jail medical clinic (M2), and ultimately to Jacksonville Shands Hospital (Shands). See id. He states that Banks questioned his cellmates while he was in M2. See id. at ¶ 44. According to Ebron, a Shands medical team prescribed pain medication, and released him the next day; the x-rays showed no broken bones. See id. at ¶ 45.

Ebron maintains that he filed six administrative grievances with the Jail from February 12 to February 15, 2012, but no one responded. See id. at 6-7, ¶¶ 46, 58. He asserts that Officer Register advised him on February 14th to file an employee complaint form, and Ebron did so that same day. See id. at ¶¶ 47, 59. He avers that he attempted to obtain and/or filed eight grievances from February 23 through April 19, 2012, but no one responded. See id. at 6-8, ¶¶ 48, 60, 62.

Ebron states that Sergeant Carter (JSO Internal Affairs Unit investigator) visited him on March 7, 2012, and informed him that an investigation of his grievances and employee complaint would be conducted. See id. at ¶ 49. He maintains that he complained about ongoing back pain, and Dr. Barnes ordered that the medical staff perform a magnetic resonance imaging (MRI). See id. at ¶ 51. He asserts that Carter transported him to the Jacksonville Police Memorial Building on March 23rd for questioning about the fall and advised him they would investigate. See id. at ¶ 50. Ebron explains that, despite Carter's suggestion that he need not file additional grievances, he still submitted grievances on March 29th, April 4th, April 9th, and April 19th, but no one responded. See id. He declares that Shands medical staff performed an MRI in April 2012, and according to Dr. Barnes, the results "revealed the presence of displacement within [Ebron's] spinal cord and possible nerve damage." Id. at ¶ 52. According to Ebron, he continued to request

and receive medical treatment while at the Jail, and was transferred to Florida State Prison on July 31, 2012. <u>See</u> <u>id.</u> at 7-8, ¶¶ 53, 63. He proclaims that JSO reached a final disposition in the internal affairs investigation on May 25, 2012, and after inquiring, he became aware of the disposition in July 2013, and got a copy of JSO's final decision in November 2013 after his father made a public records request and paid for it. <u>See</u> <u>id.</u> at ¶¶ 55, 64. Ebron maintains that he fully exhausted the Jail's administrative remedies. <u>See</u> <u>id.</u> at 8, ¶ 68.

### III. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[5] An issue is genuine when the evidence is

---

[5] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a

such that a reasonable jury could return a verdict in favor of the non-moving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (quoting <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." <u>Kesinger ex rel. Estate of Kesinger v. Herrington</u>, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation

---

matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

<u>Id.</u> "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." <u>Campbell v. Shinseki</u>, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## IV. Discussion

### A. Law

With respect to the appropriate analysis in a conditions of confinement case involving a pretrial detainee, the Eleventh Circuit "historically" has "treated convicted prisoners' Eighth Amendment claims and pretrial detainees' Fourteenth Amendment claims identically." <u>White v. Cochran</u>, No. 16-17490-G, 2017 WL 6492004, at *2 (11th Cir. Nov. 27, 2017) (citation and footnote omitted). Notably, the Eleventh Circuit clarified:

> The Supreme Court stated in <u>Kingsley v. Hendrickson</u> that the language of the Eighth Amendment's Cruel and Unusual Punishment Clause and the Fourteenth Amendment's Due Process Clause "differs, and the nature of the claims often differs." 135 S.Ct. 2466, 2473–76 (2015) (adopting a different test to evaluate pretrial detainees' excessive-force claims than the test used to evaluate convicted prisoners' excessive-force claims). However, we recently stated that <u>Kingsley</u> "is not squarely on point with and does not actually

> abrogate or directly conflict with" precedent
> outside of the context of an excessive-force
> claim. <u>See</u> <u>Dang ex rel Dang v. Sheriff,</u>
> <u>Seminole Cty. Fla.</u>, 871 F.3d 1272, 1279 n.2
> (11th Cir. 2017) (quotations omitted).

<u>White</u>, 2017 WL 6492004, at *2 n.1.

The Eighth Amendment does not apply to Ebron, who was a pretrial detainee at the time of the February 10, 2012 incident at the Jail. <u>See</u> <u>Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.</u>, 871 F.3d 1272, 1279 (11th Cir. 2017). Nevertheless, the standard for providing basic human needs and a safe environment to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments. <u>Id.</u>; <u>see</u> <u>Goodman v. Kimbrough</u>, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013) ("Regardless of the particular taxonomy under which we analyze the case, however, the result is the same, because 'the standards under the Fourteenth Amendment are identical to those under the Eighth.'") (citation omitted); <u>Johnson v. Bessemer, Ala., City of</u>, No. 17-13122, 2018 WL 3359672, at *3 n.5 (11th Cir. July 10, 2018) (per curiam) (stating that <u>Kingsley v. Hendrickson</u>, 135 S.Ct. 2466 (2015),[6] involving a pretrial detainee's excessive force claim, "does not undermine our earlier Eighth Amendment deliberate indifference precedents").

The Eleventh Circuit has explained the requirements for an Eighth Amendment violation.

---

[6] The United States Supreme Court held that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." <u>Kingsley</u>, 135 S.Ct. at 2473.

> "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." <u>Farmer</u>, 511 U.S. at 832, 114 S.Ct. at 1976 (internal quotation and citation omitted).[7] Thus, in its prohibition of "cruel and unusual punishments," the Eighth Amendment requires that prison officials provide humane conditions of confinement. <u>Id.</u> However, as noted above, only those conditions which objectively amount to an "extreme deprivation" violating contemporary standards of decency are subject to Eighth Amendment scrutiny. <u>Hudson</u>, 503 U.S. at 8-9, 112 S.Ct. at 1000.[8] Furthermore, it is only a prison official's subjective deliberate indifference to the substantial risk of serious harm caused by such conditions that gives rise to an Eighth Amendment violation. <u>Farmer</u>, 511 U.S. at 828, 114 S.Ct. at 1974 (quotation and citation omitted); <u>Wilson</u>, 501 U.S. at 303, 111 S.Ct. at 2327.[9]

<u>Thomas v. Bryant</u>, 614 F.3d 1288, 1306-07 (11th Cir. 2010). The Eighth Amendment also requires prison officials to "take reasonable measures to guarantee the safety of the inmates." <u>Farmer</u>, 511 U.S. 832) (quoting <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-27 (1984)). However, not every injury that a prisoner suffers as a result of a prison condition necessarily equates to a constitutional violation. <u>See</u> <u>Goodman</u>, 718 F.3d at 1333. Only injuries that occur as a result of a prison official's deliberate indifference rise to the level of an Eighth Amendment violation. <u>See</u> <u>Farmer</u>, 511 U.S. at 834.

---

[7] <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).

[8] <u>Hudson v. McMillian</u>, 503 U.S. 1 (1992).

[9] <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991).

> To survive summary judgment in a case alleging
> deliberate indifference, a plaintiff must
> "produce sufficient evidence of (1) a
> substantial risk of serious harm; (2) the
> defendants' deliberate indifference to that
> risk; and (3) causation." <u>Carter v. Galloway</u>,
> 352 F.3d 1346, 1349 (11th Cir. 2003) (per
> curiam) (internal quotation marks omitted).

<u>Goodman</u>, 718 F.3d at 1331 (footnote omitted); <u>see</u> <u>Johnson</u>, 2018 WL 3359672, at *3 (stating that, to prevail on a deliberate indifference claim, a plaintiff must satisfy (1) the objective component; (2) the subjective component, i.e., that the prison official acted with deliberate indifference; and (3) the causation requirement). A plaintiff who claims deliberate indifference must prove: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." <u>Melton v. Abston</u>, 841 F.3d 1207, 1223 (11th Cir. 2016) (per curiam) (citations and footnote omitted);[10] <u>see</u> <u>Scott v. Miami Dade Cty.</u>, 657 F. App'x 877, 883 (11th Cir. 2016) (stating that "a plaintiff must allege facts that would allow a jury to conclude

---

[10] The Eleventh Circuit recognizes the contradictory law in this circuit as to whether a claim of deliberate indifference requires proof of "more than mere negligence" or "more than gross negligence." <u>See</u> <u>Melton</u>, 841 F.3d at 1223 n.2. The Court reasoned that it "must follow" the Court's decision in <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999), which "is the earliest Eleventh Circuit case after <u>Farmer</u> to directly address the degree of culpability required under <u>Farmer</u> . . . ." <u>See</u> <u>id.</u> (citation omitted). This Court notes that the Eleventh Circuit, in an unpublished opinion, recently used the "more than gross negligence" standard. <u>Johnson</u>, 2018 WL 3359672, at *5-6. Nevertheless, because the Eleventh Circuit explicitly addressed the issue in <u>Melton</u>, this Court will apply the "more than mere negligence" standard. <u>See</u> <u>Dang</u>, 871 F.3d at 1280 (citing <u>McElligott</u>, 182 F.3d at 1255).

that: the defendant actually knew that the plaintiff faced a substantial risk of serious harm" (subjective component), and "the defendant disregarded that known risk by failing to respond to it in an objectively reasonable manner" (objective component)).

The Eleventh Circuit has explained the requirement of deliberate indifference to a substantial risk of harm as follows:

> Proof of deliberate indifference requires a great deal more than does proof of negligence: "To be deliberately indifferent a prison official must know of and disregard 'an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" <u>Purcell</u>, 400 F.3d at 1319-20 (emphasis supplied) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994)).[11]
>
> In other words, a plaintiff in [Ebron]'s position must show not only that there was a substantial risk of serious harm, but also that [Defendants] "subjectively knew of the substantial risk of serious harm and that [they] knowingly or recklessly disregarded that risk." <u>Hale</u>, 50 F.3d at 1583 (alteration omitted) (internal quotation marks omitted).[12] Whether prison officials had the requisite awareness of the risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." <u>Farmer</u>, 511 U.S. at 842, 114 S.Ct. at 1981 (citation omitted). At the same time, the

---

[11] <u>Purcell v. Toombs Cty., Ga.</u>, 400 F.3d 1313 (11th Cir. 2005).

[12] <u>Hale v. Tallapoosa Cty.</u>, 50 F.3d 1579 (11th Cir. 1995).

> deliberate indifference standard — and the
> subjective awareness required by it — is far
> more onerous than normal tort-based standards
> of conduct sounding in negligence: "Merely
> negligent failure to protect an inmate from
> attack does not justify liability under [§]
> 1983." <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537
> (11th Cir. 1990) (per curiam). And needless to
> say, to defeat a motion for summary judgment,
> [a plaintiff] must adduce specific evidence
> from which a jury could reasonably find in his
> favor; "[t]he mere existence of a scintilla of
> evidence in support of [his] position will be
> insufficient." <u>Anderson</u>, 477 U.S. at 252, 106
> S.Ct. at 2512.

<u>Goodman</u>, 718 F.3d at 1332 (emphasis deleted).

## B. Fourteenth Amendment Due Process

Ebron asserts that Bridgeman exposed him to harmful jail conditions and a substantial risk of serious harm on February 10, 2012, when he punctured the water bag with his knife, left the water bag and spillage on the cell floor, locked the cell door for an hour and thirty-five minutes until just before evening lockdown, and failed to ensure that the cell was safe for Ebron's re-entry. <u>See</u> Complaint at 8. Additionally, Ebron avers that Stafford exposed him to a substantial risk of serious harm when he used the switchboard to permit Bridgeman access to Ebron's dormitory and cell, and failed to respond appropriately to "abate" the risk. <u>Id.</u> at 9. Defendants maintain that "there is no testimony or evidence that [Ebron] advances that the Defendants' actions or conduct rise to a level of more than mere negligence on their part." Motion at 10. They argue that they neither prevented Ebron from cleaning his

cell once the cell door was open, nor threatened nor directed him to enter his cell so he would slip and fall. See id. They state that they failed to have the cell cleaned before the lockdown process began because of the housing unit demands during the evening shift. See id. Ebron contends that there are genuine issues of material fact that preclude summary judgment in Defendants' favor, see Response, and provides a statement of disputed factual issues, see Statement.

The relevant facts as to how the February 10, 2012 events unfolded are as follows. Ebron and three other inmates were in his cell exercising with a water bag that he knew was contraband. See Ebron Depo. at 68-69, 73. Ebron had filled the bag with water "on a day prior" to the incident. Id. at 69. The makeshift weight was a clear trash bag filled with water that weighed about thirty-five to forty-five pounds and measured approximately sixteen inches in diameter and nineteen to twenty inches in height. See id. at 69-71; Bridgeman Decl. at 4, ¶ 12. Bridgeman explains how jail inmates use water bags to exercise.

> Inmates make weights out of the 30 gallon clear garbage bags used at the PTDF [(Pretrial Detention Facility)]. They fill them with water and then take a sheet and wrap the water-filled garbage bag with a knot-handle resembling a kettle bell weight. This type of home-made weight is considered contraband at the PTDF.

Bridgeman Decl. at 3, ¶ 10. At approximately 6:45 p.m., Ebron saw Bridgeman and Stafford "looking" in his direction from the control

booth. Ebron Depo. at 83. Ebron saw Bridgeman enter the dormitory and make "a straight beeline" to his cell, and therefore, "ducked down" and slid the water bag under his cellmate's bed. Id. at 85-87. He then sat on a stool next to the bed in a further attempt to conceal the water bag and make it appear as if he and the others were just talking. See id. at 87.

According to Ebron, Bridgeman brandished a pocket knife "up against his thigh"[13] as he entered the cell and told Ebron to get up from the stool and move away from the water bag. Id. at 86, 89. Bridgeman and Ebron's accounts differ as to whether the inmates were present in the cell when Bridgeman searched under the bed and punctured the water bag. Ebron maintains that he and the other inmates stayed in the cell and watched the water spill on the floor, and then Bridgeman directed them to exit the cell. See id. at 89; see also Carter's Report at 13. Bridgeman avers that he ordered the inmates to exit the cell before he began the cell search. See Bridgeman Decl. at 3, ¶ 11. He explains, in pertinent part:

> I would not have conducted a search of a cell
> while inmates remained in the cell. More to

---

[13] During a JSO investigation into Bridgeman's conduct, Sergeant J.T. Carter interviewed Brian Long who stated he was on his bunk in the cell when Ebron and other inmates were working out with a water bag on February 10, 2012. See Carter Report at 12. According to Carter, Long told him that no one should have felt threatened when Bridgeman walked into the cell with his pocket knife opened because Bridgeman held the knife pinned against his thigh. See id. at 13.

> the point, because of officer safety, I would
> not have knelt down as Ebron claimed in his
> deposition while three inmates were behind me
> with an open pocket knife to pull out the
> water bag. It is my routine practice and
> consistent with my training to always clear a
> cell before I search it.

<u>Id.</u> at 4, ¶ 11.

Regardless of whether Ebron and his cellmates were in the cell or not, it is undisputed that Bridgeman knelt down, grabbed the concealed water bag from underneath the bed, and punctured the bag with his pocket knife. <u>See</u> Ebron Depo. at 89-90; Bridgeman Decl. at 3-4, ¶ 11. Water from the bag spilled on the floor. <u>See</u> Ebron Depo. at 89; Bridgeman Decl. at 4, ¶¶ 11-12. According to Ebron, he and the other inmates thereafter exited the cell without slipping and/or falling, and the rubber bottoms of Ebron's sneakers got wet. <u>See</u> Ebron Depo. at 93-94. Next, Bridgeman signaled to Stafford, who was in the control booth, to unlock the cell door from its open position, so Bridgeman could manually slide the door into a locked and closed position. <u>See</u> <u>id.</u> at 78-79, 89, 96; Bridgeman Decl. at 4, ¶ 13.

The cell door remained closed until the lockdown process began at 8:25 p.m. <u>See</u> Ebron Depo. at 100; Bridgeman Decl. at 5, ¶ 14. According to Ebron, he asked Stafford and Bridgeman over the intercom if he could clean his cell, but they said no. <u>See</u> Ebron Depo. at 99. Neither Stafford nor Bridgeman recall if Ebron asked to have his cell cleaned because they were busy that evening. <u>See</u>

Bridgeman Decl. at 5, ¶ 13; Stafford Decl. at 5, ¶ 18. Ebron's cellmates Thompson and Long started cleaning the cell floor when the 8:25 p.m. lockdown procedure began and the cell door opened. See Ebron Depo. at 103. Within minutes, Ebron entered the cell, took three steps inside, slipped, and fell. See Ebron's Depo. at 102, 104.

Meanwhile, during the lockdown procedure that evening, Bridgeman closed the 5W lower-level cell doors, and Officer Sutton secured the 5W upper-level cell doors. See Bridgeman Decl. at 2, ¶ 5. Ebron's cellmates notified Bridgeman that Ebron had fallen. See id.; Ebron Depo. at 109; Carter Report at 13-14. Bridgeman recalls what transpired when he entered the cell and saw Ebron on the ground.

> I approached Cell 29 and observed Ebron on the ground facing upwards. His head was towards the cell door, and his feet were towards the back of the cell. I observed a mop and mop bucket inside the cell as well. [14] Inmate Thompson took the mop and continued mopping while I spoke to Ebron. The other inmate was on the lower bed of the double bunk. The floor was slightly wet, but not soaked. I asked Ebron what happened. He stated that he slipped and fell. I asked him if he could get into a wheelchair so that he could be evaluated by medical staff. Ebron stated that he could try. I radioed to the floor control officer in the central control area to bring a wheelchair. When the floor control officer arrived, we tried to get Ebron in the

---

[14] According to Sergeant Carter, Long told him that he was mopping the water when Ebron hurriedly entered the cell. See Carter Report at 13.

wheelchair, but Ebron stated that he was in
pain. We placed him back on the ground and I
called a signal "17" (medical emergency) on
my portable radio, notifying Lieutenant R.
Bryant, Sergeant E. Banks, and all other
responding officers. This occurred at
approximately 8:36 p.m., while Officer Sutton
finished the lockdown process. Officer
Stafford remained in the control booth.

After two minutes, Lt. Bryant, Sgt.
Banks, and medical staff arrived at Cell 29.
Ebron was placed on the stretcher/gurney by
the floor control officer and another
responding correctional officer. He was then
[sic] was escorted to the M-2 clinic by
correctional officers to be evaluated. I
remained in 5W, and spoke to the [sic] Sgt.
Banks. No one other than Ebron slipped on the
floor, including those officers that had to
lift the gurney off the floor after placing
Ebron on it.

I did not see any visible signs of injury
on Ebron. Ebron's only complaint of pain was
that his back hurt.

At 8:40 p.m., I heard Sgt. Banks clear
the signal "17" because Ebron was getting
medical attention. It took about 10 minutes
for Ebron to get medical attention from the
moment I discovered him lying on the floor of
Cell 29.[15]

Bridgeman Decl. at 2-3, ¶¶ 6-9; Ebron Depo. at 110-16. Medical

personnel evaluated Ebron in M2, and sent him to Shands where he

stayed overnight, and was discharged the next morning. See Ebron

Depo. at 116-17.

---

[15] See Ebron Depo. at 113 ("I would gues[s]timate from the time
that I fell until the time I got a response, about 10 minutes or
so."); Doc. 23-3 at 10, Daily Log Report.

Stafford, a housing control officer, was assigned to control the locking and unlocking of the 5W doors, and therefore, he could not leave his post that evening. See Stafford Decl. at 1-5, ¶¶ 3, 7, 16. Ebron concedes that he was mistaken when he initially stated that Stafford made rounds with Bridgeman. See Ebron Decl. at 4, ¶ 22. Moreover, the daily log shows that Stafford was at his post inside the control booth during the time that Ebron asserted Stafford was at his cell. See Stafford Decl. at 6, ¶ 20; Doc. 23-3 at 10, Daily Log Report. Stafford saw Bridgeman and Sutton make security rounds of the four dormitories starting with 5W3 (8:26 p.m.) and ending with Ebron's 5W2 dormitory, which was secured at 8:31 p.m. See Stafford Decl. at 5, ¶ 15. Stafford documented in the daily log that a signal 17 medical emergency was called at 8:36 p.m. in 5W dormitory. See Doc. 23-3 at 10.

As a result of the February 10th incident, Ebron complained about Bridgeman's conduct. Sergeant Carter was assigned to JSO's Internal Affairs Unit to investigate such complaints. See Carter Decl. at 2, ¶ 3. In his Declaration, Carter explains the JSO investigation and disposition relating to Bridgeman's February 10th conduct.

> Due to my background and experience in corrections, I was assigned [to] the complaint by Marcus Ebron against Officer Bridgeman for disregarding Ebron's safety when he punctured a water-bag with a pocket knife and le[ft] it inside Ebron's cell until the lockdown process. I investigated Ebron's complaint and wrote a 30-page report of my investigation and

findings.[16] My investigation consisted of (9)
sworn to interviews of inmates and JSO
officers, including Marcus Ebron, Officer T.
Stafford and Officer J. Bridgeman.[17]

I investigated Ebron's complaint to I.A.
[(Internal Affairs)], which consisted of the
following: 1) that he was in fear for his
safety when Bridgeman approached the water-bag
with a knife because Ebron was close by, 2)
that Bridgeman was not truthful when he told
his supervisor how the water got on the cell
floor, and 3) that he believed Bri[dg]eman
violated his Constitutional Rights against
Cruel and Unusual Punishment when the cell was
not cleaned of the water before lock-down.

. . . .

As to Ebron's specific allegations against
Bridgeman, he stated the following:

a. In his initial complaint to I.A.,
Ebron stated, "I feared for my
safety" at the time that Bridgeman
entered his cell and approached him
with a pocket knife opened and "in-
hand." I asked Ebron the reason for
fearing Bridgeman at this time.
Ebron stated that he was in fear
because Bridgeman approached him
with an open knife. Ebron said that
Bridgeman did not make any verbal
threats while approaching him;
however, Ebron said that Bridgeman
came within a foot or two of Ebron's
body with the pocket knife prior to
Ebron moving off of the stool and
away from Bridgeman. Ebron said that
Bridgeman punctured the water bag,

---

16 See Carter Report.

17 See Carter Report (including interviews with inmates Marcus
Ebron, Brian Long, John Friend, Daniel Hall, and Damian King as
well as Sergeant Banks and Officers Sutton, Stafford, and
Bridgeman).

closed the pocket knife and then he clipped the pocket knife to the inside of his pants pocket. [There was no policy violation under Ebron's facts and the inmates in the cell who were interviewed also stated that Bridgeman did not threaten anyone during the incident.[18] Further, Officer Bridgeman's pocket knife size was within policy and carrying and puncturing the water-bag was not outside JSO policy. As such, Bridgeman was later exonerated for this allegation.]

b. As to the second allegation, Ebron stated in his complaint to I.A. that Bridgeman locked him and his cellmates out of their cell after puncturing the water bag from 6:45 p.m. [until] 8:25 p.m. as a "disciplinary agent." I asked Ebron what he meant by the term disciplinary agent. Ebron responded that a disciplinary agent is, "almost a punishment" for having a water bag in their cell, because we (inmates) know that we are not supposed to have a water bag. Ebron added that it was also considered to be punishment because they were locked out of their cell and were only able to return to the water soaked cell just prior to lockdown. [The allegation against Bri[dg]man for failing to clean the water in the cell before lock-down was sustained. Even though Bridgeman forgot because he got busy with his other duties and it was not viewed

---

[18] During Carter's interview, Long stated that no one should have felt threatened when Bridgeman used his pocket knife to puncture the water bag. See Carter Report at 13. Long, Friend, and King proclaimed that Bridgeman never threatened anyone during the incident. See id. at 13, 14, 16.

as intentional or as a form of
punishment, JSO policy requires that
officers perform their duties
properly.]

c. Ebron stated that Bridgeman was
not truthful when explaining the
facts of the incident of February
10, 2012, to his supervisor Sergeant
Banks. Ebron said that Bridgeman
told Banks on February 10, 2012,
that the bag must have burst while
the inmates were exercising with the
water bag, and not that Bridgeman
punctured the water bag with his
pocket knife. [JSO deemed this
allegation as unfounded because
Bridgeman had written a report of
the incident detailing his own
actions to his supervisor the day of
the incident. The sergeant was also
interviewed who contradicted Ebron's
second-hand account.]

During my investigation, the evidence
revealed that the emergency lights were turned
on inside Cell 29 when Ebron claims he fell.
Ebron told me that the emergency lights or
night lights were on in his cell.[19] The other
inmates in the cell corroborated that they
were able to see the water with the emergency
lights on.

Ebron stated in his I.A. interview and in
his complaint that the other inmates when they
entered the cell before lock-down were mopping
and cleaning the cell.[20] The other inmates I
interviewed corroborated Ebron's account that
one inmate was using a mop to clean up the
floor.[21]

---

[19] See Carter Report at 10.

[20] See Carter Report at 10.

[21] See Carter Report at 13.

At no time during my I.A. investigation did Ebron make any complaints about Officer T. Stafford.

In my experience with the corrections division of JSO, and in my current assignment as Chief of Jails, the 3 p.m. to 11 p.m. shift is generally very busy. The inmates are not sleeping but active in the dorms. The dorms are at capacity because all the inmates are in their dorms for dining, recreation, showers, and medication dispensation. Officers are usually busy escorting inmates to religious services or visitation appointments. Officers are busy monitoring the inmates' activities during this time as well.

Id. at 2-5 (enumerations omitted).

Dr. Dana Carol Barnes, M.D., treated Ebron for injuries that he claimed he sustained in the February 10th fall. See Barnes Decl. at 2, ¶ 6. She avers, in pertinent part:

This was the second time Plaintiff has claimed to have slipped and fallen inside the PTDF. Back in 2011, he had an injury to his toe when he slipped and fell inside the jail. After reviewing the inmate's medical records and the encounter notes made by clinical personnel, his medical history, his pain complaints, and MRI results, I opine that Mr. Ebron did not suffer any permanent damage as a result of his alleged fall on February 10, 2012.

Specifically, in paragraph 52 of Mr. Ebron's Complaint, he alleges that, "[t]he results, according to Dr. Barnes, revealed the presence of displacement within Plaintiff's spinal cord and possible nerve damage."[22] To the contrary, the results showed no displacement or nerve damage. I have attached Shands MRI results for his lumbar spine that I discussed with Mr. Ebron, which is part of Mr.

_____

[22] See Complaint at 6, ¶ 52.

Ebron's inmate medical file. (<u>See</u> Exhibit 2 - MRI results).[23]

      Mr. Ebron's inmate medical records show that he has provided several different accounts for his pain on the right side of his body. Further, the medical records showed evidence of malingering when discussing his symptoms with me and other medical personnel. He has made unsubstantiated claims of paralysis on his right side; however, his diagnostic tests showed no signs of nerve damage or paralysis. It was only at Mr. Ebron's insistence that I ordered an MRI of the lumbar spine on March 20, 2012.

      On April 23, 2012, I discussed with Mr. Ebron the results of the MRI taken of his lumbar spine at Shands Hospital. The MRI did not indicate any displacement of any structure nor any abnormality of the spine, spinal cord, nerves or discs, nor did it show any other finding that might substantiate his complaints of pain and weakness. My advice to him was to stop walking crooked, since the hunched position was likely causing him pain, and to start exercising. I also discussed with him that there was a nonspecific abnormality of the bone marrow on the MRI, the substance that produces blood cells, which is why labs were done to check on his blood counts. This finding is not associated with or caused by any injury. I further discussed this finding with Dr. Pham (hematologist) to ensure appropriate evaluation.

<u>Id.</u> at 2-3 (enumeration omitted).

     Given the evidence submitted by Defendants, the Court finds they have met their initial burden of showing, by reference to declarations and deposition and medical evidence, that Defendants Bridgeman and Stafford's conduct did not violate Ebron's federal

---

[23] <u>See</u> Doc. 23-5 at 9.

constitutional rights. Thus, Ebron is required to present evidence to show that there is a genuine issue for trial; he has not done so. If this case were to proceed to trial, Ebron would have only his testimony to support his claims. He has not presented sufficient refutation of the Defendants' evidence. The exhibits submitted by Defendants support their position that they performed their duties in such a manner that was not violative of Ebron's federal constitutional rights.

In a conditions of confinement scenario involving a pretrial detainee, a jail officer's "deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Fourteenth Amendment." See Goodman, 718 F.3d at 1331 (quoting Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003)) (footnote omitted). As previously stated, decisional law involving an Eighth Amendment deliberate indifference claim is applied in the instant action. See Scott, 657 F. App'x at 881 n.4. To survive summary judgment in a case asserting a deliberate indifference claim, a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm (objective component); (2) the defendant's deliberate indifference to that risk, i.e., the defendant actually knew that the plaintiff faced a substantial risk of serious harm (subjective component), and the defendant disregarded (by conduct that was more than mere negligence) that known risk by failing to respond to it in an objectively reasonable manner (objective

component); and (3) causation. See Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam); Scott, 657 F. App'x at 881-83 (citing Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2015)).

Undoubtedly, Ebron was under particular jail restrictions in that he neither was able to clean the wet floor of his cell nor have the cell floor cleaned before the lockdown process began. In his deposition, Ebron maintains that he "believe[s]" that Bridgeman "actually intended to punish" him and his cellmates, and therefore locked the cell "to preserve it for purposes of [them] having to sleep in a watery cell." Ebron Depo. at 123. Notably, the record evidence does not support such an unfounded belief. Ebron has not produced any evidence showing that the cell door was closed as a form of punishment. Bridgeman neither made any verbal threats nor announced that the inmates would be punished for having contraband. See id. at 87-89; Bridgeman Decl. at 4-6. Indeed, Ebron knew there was water that remained on the cell floor because he looked for cleaning cloths just as lockdown was announced. See Ebron Depo. at 102-04. Additionally, even assuming that Ebron's cell was not well lit,[24] Ebron knew the floor was wet, and saw his cellmates cleaning

---

[24] See Complaint at 4, ¶ 32 (stating Stafford turned off the lights in every cell); Ebron Depo. at 122; Bridgeman Decl. at 5, ¶ 14 ("I could see Ebron because the security lights had been turned on for the evening hours."); Carter Report at 10 (stating the main lighting for the cell had been extinguished and that the night lights were on in the cell at the time of his fall).

the wet floor as he entered to help. See id. at 102-04; Complaint at 4. The record amply reflects that Bridgeman was performing the evening's lockdown duties, and Stafford was stationed inside the control room, and therefore, neither Defendant forced Ebron to enter the cell. See Bridgeman Decl. at 5, ¶ 16; Stafford Decl. at 5, ¶ 18. Undoubtedly, JSO instructs all inmates to enter their cells at lockdown. See Ebron Depo. at 100. Nevertheless, Ebron and/or his cellmates could have remained in the day room until the issue was addressed. See Stafford Decl. at 5, ¶ 18. On this record, Ebron fails to produce sufficient evidence showing that the challenged jail condition was an "extreme" deprivation that posed an unreasonable risk of serious damage to his health or safety. Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004) (citation omitted).

Even assuming the existence of a substantial risk of serious harm, Ebron must produce sufficient evidence of Defendants' deliberate indifference to that risk. Bridgeman knew there was water on the floor of Ebron's cell. See Bridgeman Decl. at 4-5, ¶¶ 12-13. He explains how he considered his options after he punctured the water bag, and ultimately decided to lock Ebron's cell that night. See id. In doing so, Bridgeman signaled for the help of Stafford, who controlled the locking mechanism. See id. at 4, ¶ 13; Complaint at 3, ¶ 23. Bridgeman declares, in pertinent part:

> I attempted to lift the water bag so that
> I could dispose of the water in the toilet.

However, the bag was too heavy to empty it in the cell toilet. (<u>See</u> Exhibit B - (2) photographs of an empty cell 29 showing the outside cell door and configuration of beds and toilet inside the cell.)[25] The water bag weighed approximately 40 to 45 pounds. I also ruled out bringing it to the "trusty closet," which was located on the opposite end of the wing. (<u>See</u> Exhibit C - diagram of the dorm and control booth, marked with an X is the "trusty" closet.)[26] The trusty closet is where we keep all the cleaning supplies, mops, [and] mop bucket. It also has a mud-room type sink for filling and disposing of the water in mop buckets. Taking the water bag there would have required me to carry it through dorm 2, go through [the] security vestibule for dorm 2, then the hallway of 5W, then the security vestibule for dorm 3, and finally into the trusty closet. I did not do this because inmates were walking around, and I did not want [to] put them at risk. Consequently, I decided to leave the water bag in the cell, and have the cell sealed while I could supervise a trusty to come clean it up.

. . . .

I was informed by inmate Thompson that Ebron had fallen. I then realized I had not had Cell 29 cleaned before lock-down. As I entered the cell, the floor was slightly wet. I could see Ebron because the security lights had been turned on for the evening hours. It was not completely dark as Ebron claimed in his complaint.

<u>See</u> Bridgeman Decl. at 4-5, ¶¶ 12, 14. Additionally, Bridgeman declares that he "did not seal" the cell to punish anyone, but instead "to keep everyone out" until he had an opportunity to have

---

[25] <u>See</u> Doc. 23-2 at 10-11.

[26] <u>See</u> Doc. 23-2 at 13.

it cleaned. Id. at 6, ¶ 17. Stafford states that the cell door was closed and secured "to prevent an accident and allow for cleanup" and was not cleaned prior to the lockdown process because of "the demands of that night." Stafford Decl. at 5-6, ¶¶ 18, 21.

It is "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [that] violates the Eighth Amendment." Farmer, 511 U.S. at 828 (citations omitted). The deliberate indifference standard requires the plaintiff to demonstrate that the prison official "was subjectively aware" of a risk of harm; mere negligence is not sufficient. Id. at 829, 835-36. "The known risk of injury must be a 'strong likelihood, rather than a mere possibility' before a guard's failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F. 2d 1533, 1537 (11th Cir. 1990).

Here, Ebron fails to produce sufficient evidence that the Defendants actually knew he faced a substantial risk of serious harm, and disregarded that known risk by failing to respond to it in an objectively reasonable manner. Bridgeman avers that, when faced with a busy shift, he "simply forgot" to follow up and have a trusty clean the cell. Bridgeman Decl. at 6, ¶ 17; see Stafford Decl. at 3, ¶ 9. Ebron presents no evidence to dispute this other than his personal belief. Nevertheless, JSO disciplined Bridgeman "for not cleaning up the water in a timely manner." Bridgeman Decl. at 6, ¶ 17. Thus, even assuming "dereliction of duty" may have

contributed to the incident, Ebron fails to produce evidence showing Bridgeman and Stafford were deliberately indifferent to his health and safety needs. <u>Goodman</u>, 718 F.3d at 1334 (finding the dereliction of duty to be disturbing, but affirming the district court's granting of defendants' summary judgment motion based on Eighth Amendment law). The Eleventh Circuit has stated:

> Our cases are clear that to survive summary judgment on a deliberate indifference claim, the plaintiff must present some evidence of prison officials' subjective awareness of a substantial risk of serious harm to the inmate. <u>See</u>, <u>e.g.</u>, <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir.1999) (explaining that "a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk" (internal quotation marks omitted). [Plaintiff] has adduced no evidence that either [Defendant] was subjectively aware of the peril to which [Plaintiff] was exposed on the night in question, and that failure is fatal to his claim.

<u>Goodman</u>, 718 F.3d at 1333-34.

Defendants assert, and this Court agrees, that there remain no genuine issues of material fact. Given the strong and consistent declarations of Defendants Stafford and Bridgeman and Ebron's failure to provide any evidence other than his own beliefs, no reasonable jury could find for Ebron under these circumstances. <u>See id.</u> at 1332 (recognizing that "to defeat a motion for summary judgment, [the plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor; [t]he mere existence of a scintilla of evidence in support of [his] position will be

insufficient" (quotations and citation omitted)). As such, Defendants' Motion is due to be granted.

## C. Qualified Immunity

Defendants assert that they are entitled to qualified immunity. See Motion at 17-21. As to qualified immunity, the Eleventh Circuit stated:

> The qualified-immunity defense reflects an effort to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted).
>
> As a result, qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). But the doctrine's protections do not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." Harlow v. Fitzgerald, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and alteration omitted).
>
> To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. Maddox v. Stephens,

727 F.3d 1109, 1120 (11th Cir. 2013). As we
have explained the term "discretionary
authority," it "include[s] all actions of a
governmental official that (1) were undertaken
pursuant to the performance of his duties, and
(2) were within the scope of his authority."
Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir.
1994) (internal quotation marks omitted).
Here, it is clear that Defendant Officers
satisfied this requirement, as they engaged in
all of the challenged actions while on duty as
police officers conducting investigative and
seizure functions.

Because Defendant Officers have
established that they were acting within the
scope of their discretionary authority, the
burden shifts to [the plaintiff] to
demonstrate that qualified immunity is
inappropriate. See id. To do that, [the
plaintiff] must show that, when viewed in the
light most favorable to him, the facts
demonstrate that Defendant Officers violated
[Plaintiff's] constitutional right and that
that right was "clearly established ... in
light of the specific context of the case, not
as a broad general proposition[,]" at the time
of Defendant officers' actions. Saucier v.
Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150
L.Ed.2d 272 (2001), overruled in part on other
grounds by Pearson, 555 U.S. 223, 129 S.Ct.
808. We may decide these issues in either
order, but, to survive a qualified-immunity
defense, [the plaintiff] must satisfy both
showings. Maddox, 727 F.3d at 1120–21
(citation omitted).

Jones v. Fransen, 857 F.3d 843, 850-51 (11th Cir. 2017).

Defendants assert that they are entitled to qualified immunity

because they did not commit any federal statutory or constitutional

violation. See Motion at 18. Additionally, they state that even

assuming a constitutional violation, they are entitled to qualified

immunity insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known. See id. at 18-21. Under the doctrine of qualified immunity, Defendants may claim they are entitled to qualified immunity from monetary damages in their individual capacities. It is undisputed that Defendants were engaged in discretionary functions during the events at issue. To defeat qualified immunity with respect to these Defendants, Ebron must show both that a constitutional violation occurred, and that the constitutional right violated was clearly established. Upon review, Defendants are entitled to qualified immunity from monetary damages in their individual capacities.

In consideration of the foregoing, it is now

**ORDERED**:

1. Defendants' Motion for Summary Judgment (Doc. 22) is **GRANTED**.

2. The Clerk is directed to enter judgment in favor of Defendants Justin K. Bridgeman and Tyler P. Stafford, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 24th day of August, 2018.

MARCIA MORALES HOWARD
United States District Judge

sc 8/23
c:
Marcus Darnell Ebron, FDOC #J44624
Counsel of Record